Samuel J. Silverman, J.
The following constitutes my decision after trial:
This is a stockholders’ representative and derivative action, brought by a stockholder of Philadelphia and Beading Corp. (P&B) against Northwest Industries Inc. (NWI), the parent corporation of P&B, and certain of its directors.
For some years P&B had been a “ conglomerate ”, i.e., primarily an investment or holding corporation with subsidiary corporations operating in various fields of business. These subsidiaries had for the most part existed as independent, unrelated businesses and been acquired by P&B through one or another type of corporate reorganization or transaction.
In 1967 a corporation called Northwest Industries Inc. was formed to be a sort of superconglomerate to acquire control of P&B and its subsidiaries, and two other unrelated companies or sets of companies — Chicago & Northwestern Bailway Company (CNW) and Great Western Bailways Co. (GWB).
After some negotiation, the executives of P&B apparently came to the conclusion that the acquisition should be approved.
In early 1968 MWI made various exchange offers of its own securities for the stock of P&B, CNW and GWB held by the public. These exchange offers were made publicly by prospectuses and registration statements filed with the SBC and apparently complying with applicable Federal statutes and regulations.
As a result of these offers, NWI had by April 18,1968 acquired 97.2% of the common stock of P&B. By later exchange offers NWI acquired another 2% of P&B’s common stock. Since January 20, 1969, NWI has been the owner of approximately 99.3% of P&B’s outstanding common stock.
During the early months of 1968 the process of “ integrating ” P&B with NWI proceeded, pretty much doing to P&B what P&B had done to the subsidiaries it had acquired (though P&B’s subsidiaries were largely operating companies while P&B was itself a conglomerate holding company). NWI took over the functions P&B had performed, vis-á-vis its subsidiaries. Certain of the chief executive officers of P&B took the same positions with NWI, frequently holding both posts at the same time.
Before the acquisition of P&B by NWI, P&B had acted as a sort of central banker for its subsidiaries, to some extent bor *816 rowing the excess funds of any subsidiary at the prime rate of interest and lending funds to subsidiaries that needed them. NWI now took over this function, applying it to the expanded NWI corporate system. In April, 1968, however, it appears that the one large free reservoir of cash (and cash equivalents — i.e., short-term investments) in the NWI system was in P&B and its subsidiaries who together had about $59,000,000 of free cash and cash equivalents.
The Home Insurance Transaction.
By April 22,1968 Mr. Howard Newman, the former president and chairman of the board of P&B had ceased to be president of P&B and become chairman of the board of NWI. He remained chairman of the board of P&B. He now drew his entire compensation from NWI. Mr. Heineman, formerly president, chief executive officer and chairman of the. board of NWI had become president and chief executive officer of P&B, while .remaining president and chief executive officer of NWI.
On April 22, 1968, Messrs. Warren Buffett and David Gottesman, two people active in the financial and securities business, suggested to Mr. Newman the possibility of the acquisition by NWI of Home Insurance Co. (This took place at a breakfast meeting, while Mr. Newman was both chairman of the board of NWI and president and chairman of the board of P&B. His resignation as president of P&B and the election of Mr. Heine-man to that post were scheduled for and took place in the afternoon of that day.) It is clear that the suggestion was for NWI to acquire Home Insurance Co. The acquisition would have been quite impracticable for P&B in its then state, it having then only a small amount of public securities outstanding and as a practical matter probably no ready public acceptability for any large amount of securities that it might then wish to issue. Its securities were no longer listed on the New York Stock Exchange. In addition, P&B’s loan agreement imposed certain restrictions on the issuance of new debt securities which would have made it impracticable for P&B to embark upon the plan for acquisition of Home Insurance.Co. that was suggested to Mr. Newman. We may speculate as to whether — if P&B had not been acquired by NWI, and if it were still a listed company with large amounts of publicly held securities outstanding— Messrs. Buffett and Gottesman might have suggested some other plan, tailored to P&B’s situation, for the acquisition of Home Insurance by P&B. But P&B’s and NWI’s corporate and financial situations were what they were in April, 1968; *817 and there is no doubt that the plan was presented and considered as a possible acquisition by NWI, not P&R, and that the acquisition of Home Insurance Co. involving the possible issuance of $500,000,000 of new securities was not a practical project for P&R. It is perhaps significant' that the first call from Messrs. Buffett and Grottesman to Mr. Newman to arrange a meeting to discuss some undisclosed project they had in mind (which turned out to be the Home Insurance acquisition) was made after it had been publicly announced that over 87% of P&R’s common stock had been deposited under the NWI exchange offer and that this met the minimum requirements of the exchange offer.
Mr. Newman was persuaded of the desirability of the acquisition of Home Insurance Co. by NWI. He submitted the proposal in a memorandum to Mr. Heineman. Mr. Heineman and the board of NWI agreed. They decided to embark on the project of acquiring control of Home Insurance Co. To that end NWI decided to make a public offer to exchange certain proposed new securities of NWI for stock of Home Insurance Co. Registration .statement and prospectuses were prepared and filed, and the public offers were made.
At the same time that Messrs. Buffett and Grottesman were presenting to Mr. Newman the project for the acquisition of Home Insurance Co., they pointed out that there was a block of about 10% of the outstanding stock of Home Insurance Co. held by a California group called ISI which could probably be obtained at what appeared to be a reasonable price. Mr. Newman and the directors of NWI decided to acquire it if possible even before making their public exchange offer. It is clear that this decision was not intended to be a separate acquisition unrelated to the project of acquiring control of Home Insurance Co. Indeed it seems unlikely that Mr. Newman and NWI would have been interested in acquiring merely a 10% interest in Home Insurance Co. except as a step in the acquisition of the whole company. Mr. Newman and NWI considered the acquisition of this block of stock merely as a leg up on the total acquisition. They considered not making a separate offer for this block of stock but decided to acquire it partly for the impetus it would give toward acquisition of the whole company and toward acceptance by Home Insurance Co.’s public stockholders of NWl’s exchange offer, and partly to prevent the block from falling into some other group’s hands with the resultant obstacles to the success of NWl’s plan to acquire the whole company. Indeed, Mr. Newman’s memorandum of April 29,1968 to Mr. Heineman, which proposed the Home acquisition, *818 discusses only the desirability of the acquisition of Home Insurance Co. as a whole, as part of a consolidated enterprise. Nowhere in the body of the memorandum is there any reference to the ISI block. Only at the end of the memorandum, under a list of topics for oral discussion, is there any reference to the ISI block, presumably in the items “(1) Discussion of significance of certain large stockholders; (2) Purchase of a block ”.
On May 5, 1968 NWI’s executive committee, after review of Mr. Newman’s memorandum, authorized the president of NWI to acquire not to exceed 860,000 shares of Home Insurance stock at an average cash price not to exceed $32 a share.
It having been decided to acquire this block of stock, Mr. Newman negotiated for it and entered into a contract for the purchase of 838,350 shares or about 9.6% of Home’s stock at $30.25 per share or a total gross price of $25,646,216. The parties agreed that if NWT should make a public exchange offer for Home Insurance Co. stock, the sellers could at their option have the benefit of that exchange offer.
NWT had several sources available to it for the approximately $26,000,000 needed to acquire this block. One was to borrow from banks at the prime rate of interest (with probably the .necessity for maintaining some compensating balance at the lending bank which would have the effect of increasing the effective interest rate of the loan). Another was to borrow from P&R and its subsidiaries whose cash was invested in short-term securities at less than the prime rate of interest. The executive board of NWT in authorizing the acquisition of the ISI block on May 5, 1968, did not direct that the funds come from any particular source. Instead the resolution authorized the president “to take such action * * * in connection ” with the acquisition of this block of stock “ as he may deem proper ” including “ the making of payments and the borrowing of funds. ’ ’ And the next resolution in the minutes of May 5, 1968, supplemented the authority of the president ‘ ‘ to borrow on behalf of this Corporation from lenders not owned or controlled * * * by this Corporation ” so as to authorize him to borrow up to $25,000,000 at any one time outstanding. The matter was left to Mr. Weir, the chief financial officer of NWT and P&R (formerly of P&R above), who decided that it would be a more profitable investment of P&R’s funds for NWI to borrow from P&R at prime rate. (In fact as it turned out, it was a little less profitable than keeping the funds invested in short-term investments, but the difference was so small, in relation to the amounts involved, that I think it can be ignored and the traps- *819 action treated as a switch of funds between two forms of investment with substantially the same return.)
Accordingly, NWI borrowed $5,500,000 from P&E and $20,-500,000 from P&E’s wholly-owned subsidiary Lone Star Steel at 6%%, the then prime rate. One loan was represented by a demand note, the other by a note due June 17,1968.
NWI acquired the block of Home Insurance Co. on or about May 14,1968. Pursuant to authority of its executive committee at a meeting of May 22, 1968, NWI made a public exchange offer (involving some $500,000,000 of securities) for the remaining publicly-held securities of Home Insurance Co. A rival offer was made by another company, City Investing Co. The management of Home Insurance Co. announced that it favored City Investing Co.’s proposal and opposed NWI’s. NWI decided to withdraw from the contest. On June 27, 1968, NWI withdrew its exchange offer. And in June, 1968, it sold its block of Home Insurance Co. stock to City Investing Co. at $60 per share for a gross sum of approximately $50,301,000, realizing a gross profit of approximately $24,950,000. (The net profit before taxes was $22,636,000; after taxes it was $16,650,000.)
NWI promptly repaid the loans to P&E and Lone Star Steel. Within the limitations inherent in the parent-subsidiary relationship, with many financial transactions between them, this was a real repayment, and not just a matter of book entries. Although NWI continuously remained in a debtor relationship to P&E and its subsidiaries, none of that continuing debt can fairly be said to be merely a renewal or continuation of the $26,000,000 loans from P&E and Lone Star Steel in connection with the Home Insurance Co. acquisition.
Plaintiff contends that the acquisition of the block of Home Insurance Co. stock was a corporate opportunity of P&E and that therefore P&E is entitled to the profit on the resale. •
I do not agree that this was a P&E corporate opportunity. It was intended by all parites to be an NWI transaction, and in the situation that existed on April 22,1968, the over-all proposal for the acquisition of Home Insurance Co. as a practical matter had to be and was an NWI project rather than a P&E project.
Neither was'the acquisition of the ISI block of 9.6% of Home Insurance Co. a P&E corporate opportunity, to the profit of which P&E would be entitled. Even though P&E had the financial capability of buying this block of stock, it obviously would not have bought that block alone. Even before its acquisition by NWI, P&E had never (in the five years before 1968) acquired a minority interest in a corporation. As a conglomerate it would *820 not be interested in acquisition of a minority interest. The Home Insurance stock was not purchased for resale. If the Home Insurance transaction had resulted in a loss, NWI and not P&R would have had to bear it. And the purchase of the block of Home Insurance stock was not considered by either buyer or seller as an isolated transaction. The contract contained a provision extending to the sellers the benefit of any future public offer; only NWI could make such an offer; P&R obviously was not going to make any public offer.
Plaintiff’s brief suggests that because P&R was a conglomerate, it was entitled to any acquisition opportunity that came to the attention of the chairman of its board, even though he was also chairman of the board of its parent company; that “the world of business is the boundary of the conglomerate’s expansion area”. At least for purposes of the diversion-of - corporate-opportunity doctrine, I cannot accept this argument. No company can claim a superior right to go into all businesses of any nature that may come along. As the Delaware Supreme Court said in Johnston, v. Greene (35 Del. Oh. 2d 479, 488): “ It is one thing to say that a corporation with funds to invest has a general interest in investing those funds; it is quite another to say that such a corporation has a specific interest attaching in equity to any and every business opportunity that may come to any of its directors in his individual capacity * * * Such a sweeping extension of the rule of corporaté opportunity finds no support in the decisions and is, we think, unsound ”. Only opportunities in which the complaining corporation ‘ ‘ had a tangible expectancy ” at the time of the transaction (Blaustein v. Pan Amer. Petroleum & Transp. Go. (293 N. T. 281, 309) are subject to the diversion-of-corporate-opportunity doctrine. Here P&R had no such “tangible expectancy”. Even if we assume that there is such a thing as a “ conglomerate business ” (rather than the term “ conglomerate ” being merely a description of a company that controls a group of other companies engaged in unrelated businesses), the acquisition of a 9.6% interest in the stock of another corporation, considered separately, would be no part of the “ conglomerate business ”; it would be merely an investment of surplus funds.
Finally, I note that the decision of over 97% of P&R’s common stockholders to exchange their stock for NWI was a clear determination by the overwhelming majority of P&R’s stockholders that P&R should cease making acquisitions of unrelated businesses — a permissible business decision.
*821 Accordingly, I hold that P&R is not entitled to any part of the profits on the Home Insurance transaction.
There remains the question whether P&R and Lone Star Steel were adequately compensated for the use of their money. It is not enough to say that the prime rate of interest was at least equal to and perhaps more than P&R could earn on its money. NWI as holder of 97% of P&R’s stock was in a fiduciary position vis-á-vis P&R’s minority stockholders. If it borrowed money from P&R, it had to pay P&R at least what it would have had to pay an outsider to borrow the money. I am satisfied that NWI could have borrowed the money from banks at the prime rate of interest — the same rate it paid P&R and Lone Star. But in practice, it would have had to keep, compensating balance on deposit, which would have increased the effective rate of interest. P&R and Lone Star are entitled to that higher effective rate of interest.
The record is unsatisfactory as to what that higher effective rate would have been. If the parties cannot agree, the issue of the probable effective rate of interest will be referred to a referee to hear and report. P&R -and Lone Star are entitled to the excess of the effective rate over the prime rate.
Although Lone Star is not technically a party to the lawsuit, plaintiff, as a stockholder of P&R, Lone Star’s parent, can sue on Lone Star’s behalf '(Holmes v. Camp, 180 App. Div. 409 [1st Dept., 1917]); the issues in this litigation have clearly included the use of Lone Star’s $20,500,000 as well as P&R’s $5,500,000; and I think it just and within my powers to give relief on behalf of both corporations.
The Increase of the P&R Preferred Dividend.
P&R had outstanding in early 1968 — and apparently still has outstanding — 248,542 shares of preferred stock. In 1968, this stock carried a $5 per share dividend. Primarily for NWI’s tax reasons, it appeared inadvisable for NWI to make an exchange offer to P&R’s preferred stockholders. Mr. Newman wished to negotiate some benefit for the preferred stockholders. Accordingly, in connection with the negotiations for the NWI— P&R common stock exchange offer, it was agreed that NWI would vote its common stock of P&R in favor of an increase in the P&R preferred dividend from $5 to $6 per share. This was clearly stated in the exchange offer prospectus, and the 97% of P&R’s common stockholders who exchanged their stock for NWI securities must be deemed to have consented to that increase. Certainly NWI as owner now of over 99% of P&R’s common stock cannot object.
*822 After the exchanges had become effective, the preferred stock increase was voted on June 10, 1968, by the requisite majorities of P&R common and preferréd stock. Only 3,015 shares (about 0.1%) of P&R common stock, voted against the increase.
. I cannot see any proper corporate purpose of P&R, or any benefit to its common stockholders, generally, that was served by the increase in the preferred stock dividend rate. The issue is not, as defendants suggest, whether the statutes relating to corporate amendments give the holder of an extraordinary majority the power to alter theretofore “ vested rights ”. It is rather, conceding the ‘ ‘ power ’ ’, whether in exercising that power, the controlling stockholder violated the fiduciary obligation arising from the very existence of that power (and historic doctrines of equity), an obligation which exists whenever one person has control over the property of another. The power of a majority, however great, over the minority extends only to its exercise in good faith for the benefit of the whole group. In that context the increase was not intended in good faith for the benefit of the whole group of common stockholders, but was for the purpose of making the exchange offer more palatable. This was not a purpose for which the nonconsenting minority of P&R common stockholders could be required to pay.
If additional dividends were to be declared, they belonged to the common shareholders. Accordingly, this $248,542 per year of additional preferred dividends should have been declared pro rata to the common stockholders. NWI as holder of 99.3% of the common stock can and did waive its .share of that $248,542. The nonexchanging common stockholders — now about 0.7% — did not. They are entitled to additional dividends, per share, equalling all past and future $1 additional dividends paid to preferred stock divided by the total number of shares of common stock of P&R, carried to the nearest convenient fraction of a cent dividend per share. Judgment is directed accordingly.
Effect of Only 0.7% Common Stock Outstanding.
I have directed certain judgments with respect to both transactions here involved.
As to the dividends, it seems direct and practical to limit judgment to the publicly-held common stock (held by others than NWI), and to direct the payment of such additional dividends directly to -such stockholders, and the judgment will so direct.
As to the increase of interest rate to be paid to P&R and Lone Star Steel, although in reality only the nonexchanging common *823 stockholders are affected, I think it simpler and more logical and in accordance with corporate practice to direct judgment for the whole amount in favor of P&R and Lone Star Steel as corporate entities.
I reserve the question of attorneys’ fees and the effect of the foregoing on attorneys’ fees until the submission of the final judgment at which time the parties may make appropriate applications.